IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:19-CR-65-TAV-DCP |
| VIRGIL CRAWFORD, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Judge as may be appropriate. This matter is before the Court upon Defendant Crawford's Motion to Suppress Evidence [Doc. 300], filed on November 1, 2019, as well as Defendant's Memorandum in Support [Doc. 314], filed on November 8, 2019. The Government filed a response in opposition to the motion [Doc. 334] on December 10, 2019. An evidentiary hearing was held on Defendant's Motion to Suppress [Doc. 300] on December 17, 2019. [Doc. 337]. Assistant United States Attorney Brent Jones appeared on behalf of the Government. Attorney Jessica McAfee[1] represented Defendant, who was also present. At the conclusion of the evidentiary hearing, defense counsel asked to file a post-hearing brief in lieu of argument on the motion. The Court granted the request and directed that both parties file post-hearing briefs by January 3, 2020. Defendant timely filed a post-hearing brief [Doc. 352] on

---

[1] Attorney McAfee was substituted and appointed on December 5, 2020, following the granting of First Motion to Withdraw [Doc. 322] by Attorney Michael Cabage. [Doc. 331].

January 3, 2020.  The Government subsequently filed a post-hearing brief [Doc. 387] on February 11, 2020.

On January 2, 2020, Defendant filed a Motion to Accept Late-Filed Exhibits [Doc. 348], stating that in preparing the post-hearing brief, defense counsel realized that three additional exhibits (a receipt for items seized during the execution of a search warrant at Defendant's residence and two photographs taken during the execution of the search warrant) would be helpful to the Court.[2]  On January 13, 2020, the Government responded [Doc. 361] that it did not object to the motion for the Court to consider the additional exhibits, and generally renewed its request that the Court deny the Defendant's Motion to Suppress Evidence.  The Court granted Defendant's Motion [Doc. 348], and the receipt and two photographs were admitted as late-filed exhibits to the suppression hearing.  [Doc. 368].

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress [Doc. 300] be **GRANTED IN PART AND DENIED IN PART** as set forth below.

## I.       POSITIONS OF THE PARTIES

The Superseding Indictment [Doc. 99] charges twenty-three Defendants, including Defendant Crawford, with conspiring to distribute and possess with intent to distribute heroin and fentanyl (Count One), over nearly one year.  Defendant Crawford is also charged with a substantive count of drug distribution (Count Sixteen).  Defendant was arrested on April 22, 2019, following

---

[2] Defendant noted that the proposed exhibits were created by law enforcement during the search of Defendant's residence and provided by the Government in discovery.

2

the federal Grand Jury's return of the original indictment on April 16, 2019. Defendant was arrested at his residence located at 1203 Texas Avenue, Knoxville, Tennessee ("the residence").

Defendant seeks [Doc. 300] to suppress physical evidence seized during a search of the residence. Specifically, Defendant asserts that when he initially gave consent for officers "to take a look around, and see if anything was laying out" [Doc. 352 at 5], he did not give consent "to search," and officers exceeded the scope of consent when they found certain items inside of dresser drawers as well as a powdery substance inside of a pill bottle, which were not in "plain view." [*Id.* at 4–5; 8–9]. Further, Defendant argues that there was insufficient information to establish probable cause for a search warrant for the safe and filing cabinet located in his bedroom, because the "basis. . . was based, in part, on the officers' unfettered search of the Defendant's dresser drawers and other areas." [*Id.* at 5]. Finally, Defendant maintains that in the event the Court finds that law enforcement had consent to search his residence, especially after the issuance of a search warrant, he requests suppression of items found in places outside the limited scope of the search warrant. [*Id.* at 10].

The Government responds [Doc. 334] that Defendant has failed to establish a prima facie case of a constitutional violation. The Government argues that Defendant initially consented to the search of his residence and that the consent was not coerced. [*Id.* at 4]. Specifically, the Government asserts that Defendant "consented to the search of his home by responding 'sure'" to law enforcement's questioning, as well as "by asking the officers to retrieve shoes from his bedroom." [Doc. 387 at 3]. After Defendant revoked consent, the officer obtained other information from people present at the residence as to the location of drugs and used that information to seek a warrant for the search of the safe and filing cabinet in Defendant's bedroom. [Doc. 334 at 5]. Therefore, the Government contends that even if the cocaine and digital scales

3

found within Defendant's dresser were excluded, probable cause still exists to support the search warrant. [Doc. 387 at 6].

## II.    SUMMARY OF TESTIMONY

At the January 29 hearing, the Government presented the testimony of Knoxville Police Department Investigator John Holmes ("Investigator Holmes") and referenced the April 22, 2019 audio recording made during the arrest of Defendant (Attachment 1 to Government's Response to Defendant's Motion to Suppress [Doc. 361]).[3]  In addition, the Court considered the April 22, 2019 Search Warrant for the filing cabinet and safe inside the residence [Doc. 334-1] as well as the Affidavit in Support of Search Warrant [Doc. 334-2], both of which were filed as attachments to the Government's Response [Doc. 334].  Defendant testified on his own behalf regarding the circumstances of the search and the issue of consent to search the residence.

The Government first presented the testimony of Investigator Holmes.  Holmes has been in law enforcement over 18 years, and is assigned to the drug-related task force as an investigator. [Tr. at 5].  Investigator Holmes testified that on April 22, 2019, he was involved in the execution of an arrest warrant for Defendant at 1203 Texas Avenue in Knoxville.  [*Id.* at 5–6].  He explained that he was a "team lead" and had three uniformed officers and one plain-clothes officer accompany him to execute the arrest warrant.  [*Id.* at 6].  Upon arrival at the location, the uniformed officers knocked at the door, and when Defendant opened the door, he was taken into custody just inside the doorway.  [*Id.*].  Investigator Holmes further stated that there were two additional subjects, Jessica and Stephen Bouvier, in the living room of the residence, who were taken into custody as they also had arrest warrants for them. [*Id.* at 6, 13].  Three other persons in the living

---

[3] Investigator Holmes testified that he advised Defendant that they were being audio recorded.  [Tr. at 7].

4

room were temporarily detained while officers gathered their information and checked for warrants. [*Id.* at 6-7].

Investigator Holmes testified that he then took Defendant outside in the driveway to the side of the house, where he advised Defendant of the charges and his Miranda rights. [*Id.* at 7]. After being advised of his rights, Defendant continued to talk with Investigator Holmes. [*Id.* at 8]. When Investigator Holmes asked Defendant if there was anything in the residence to be concerned about, Defendant responded, "Like what?" [*Id.*]. Investigator Holmes testified that he was referring to such things as weapons and needles and that he specifically asked Defendant if there was any fentanyl, which can be absorbed through the skin, to which Defendant replied, "No." [*Id.* at 8, 23]. Then, Investigator Holmes asked Defendant "if he cared if the officers walked around the residence and looked around to see if anything was lying out," to which Defendant responded, "Sure." [*Id.*].[4] At that point, Investigator Holmes notified Officer Blaine that "they could start looking around the residence." [*Id.* at 8]. On cross examination, Investigator Holmes clarified that it was his understanding that "[Defendant] was letting [him] [ ] search the whole residence," and that if officers opened the dresser drawer to search inside, "that would fit into what [Defendant] was saying 'sure' to." [*Id.* at 22]. He agreed that his concern was to determine whether there were any more drugs in the residence, as he had set up surveillance that morning prior to executing the arrest warrants and "watched multiple cars come and go within matter of moments . . . which [he] perceived to be drug activity." [*Id.* at 22–23].

---

[4] The Court notes that the Transcript states that Investigator Holmes questioned Defendant to see if anything was "lying" out [*Id.*], while the parties responded in their briefs that Investigator Holmes asked to see if anything was "laying" out. *See* [Doc. 352 at 5]; [Doc. 387 at 2]. Finding no substantive difference, the Court will apply the wording used by the parties.

5

At this same time, Defendant, who was not wearing any shoes, asked if he could get a pair, and directed an officer to the front right bedroom, facing the street, stating his shoes were located there. [*Id.* at 9]. Investigator Holmes testified that he had Defendant searched and that Defendant had in his possession $577 in U.S. currency and two key rings with multiple keys on it that Defendant indicated belonged to him. [*Id.*]. After he was searched, Defendant was placed in a cruiser. [*Id.*].

Investigator Holmes then interviewed Stephen and Jessica Bouvier.[5] [*Id.*]. He testified that the Bouviers both stated the Defendant would keep contraband in a safe inside his bedroom, which they identified as the front bedroom of the residence [*Id.* at 10], and added that Defendant had received a delivery as recent as that morning or the day prior. [*Id.*]. Investigator Holmes detailed that he first interviewed Stephen Bouvier, who at some point, stated that Defendant kept drugs in his room in the safe. [*Id.* at 18]. He further stated that as he concluded his interview with Jessica Bouvier, a uniformed officer walked up and advised that "they observed . . . what they believed to be crack cocaine on the dresser, a locked safe, and a locked file cabinet in the bedroom." [*Id.* at 10, 16–17].

Investigator Holmes then explained that he went back to the cruiser where Defendant was sitting and asked if one of the keys on Defendant's key ring would fit the safe or the file cabinet and advised Defendant that the officers found what appeared to cocaine in the bedroom. [*Id.* at 10–11]. Defendant hesitated, and then stated that "he didn't recall giving [Investigator Holmes] consent to search the residence." [*Id.* at 11]. Investigator Holmes testified that he then went back to the residence and pulled out the officers as well as the three remaining subjects on whom they

---

[5] Investigator Holmes stated that the interview of Stephen and Jessica Bouvier was audio recorded. [Tr. at 9-10].

6

were still running records. [*Id.* at 11, 16]. Prior to leaving the residence, Investigator Holmes stated that he took photos of the locked safe and file cabinet. [*Id.*]. In reviewing the photos during his testimony, Investigator Holmes explained that the safe was positioned on top of the filing cabinet. [*Id.* at 20]. When asked on cross examination whether anything incriminating was visible to the eye on top of the safe, Investigator Holmes said, "The only thing I can recall, there was a digital -- or a camera set up facing the safe on the dresser, facing the actual safe itself. And just behind the safe, to the left of the safe, there was a canister of Benefiber or some semblance . . . which is common for cutting into heroin." [*Id.* at 18]. He further detailed that the clear baggie of suspected cocaine on the dresser was located approximately two feet from the safe. [*Id.*]. Investigator Holmes also explained during cross examination that he thought drugs would be in the filing cabinet because both the safe and filing cabinet were locked; the position of the camera was facing the safe and the filing cabinet; there were cutting agents for heroin; and "[I]t's common for individuals that distribute drugs to store those items where other individuals that frequent their house don't have access to it." [*Id.*].

Investigator Holmes testified that later that day, he provided information and the photos to Special Agent Peter Wooden ("SA Wooden"), Drug Enforcement Administration, for the purpose of obtaining a search warrant. [*Id.* at 11, 14]. Investigator Holmes waited at the residence until SA Wooden arrived back with the search warrant, and then they reentered the residence with one of the keys from Defendant's key ring. [*Id.* at 11]. Investigator Holmes stated that the uniformed officers unlocked the safe and the file cabinet while he recorded the contents. [*Id.* at 15]. Inside the safe, they found Defendant's ID, a pill bottle which contained over eight grams of heroin, $3,850 in U.S. currency, and a pill bottle that contained a white, rock substance believed to be

cocaine. [*Id.* at 11]. In the file cabinet, they discovered 109 Gabapentin pills, multiple naloxone, and syringes. All of the suspected drugs were sent off for testing. [*Id.* at 12].

The Government further relied upon the audio recording made during Defendant's arrest. In the audio recording, at approximately 3:48, Investigator Holmes asks Defendant, "Look, is there anything that I need to worry about inside the house - - anything that might be potentially dangerous to the guys, officers that are standing inside? Anything - - any fentanyl?" Defendant responds, "Nah." At approximately 4:03, Investigator Holmes asks Defendant, "Do you care if we just walk around, look, make sure nothing is laying out?" Defendant responds, "Sure."

At the hearing, a portion of the audio recording of the conversation between Investigator Holmes and Defendant was played. Defendant then testified as follows:

> Q. When [Investigator Holmes] asked you whether he could search the residence or the officers with him could search the residence, did you give consent?
>
> A. I did not give consent to search the residence. I was -- he said he was going to check to see if anything was in there to hurt or harm them. I did not mean go in there and start grabbing through drawers and looking around. You know, a plain view walk-through is one thing. But when you go start looking through drawers, and you're searching the home. I didn't give consent to that.

[*Id.* at 31–32]. Defendant further testified that while he gave officers authority to go in the residence to retrieve his shoes from the room where the filing cabinet and safe were located, he did not give consent to go through drawers. [*Id.* at 32–33]. Defendant also explained that he rented the house, but Stephen and Jessica Bouvier lived in the house with him. [*Id.* at 34].

On cross examination, Defendant acknowledged that the safe and filing cabinet belonged to him. [*Id.* at 33]. Defendant agreed that he told Investigator Holmes that he could "do a walk-through" of the house, but denied that there anything laying out in plain sight in the bedroom, stating that "[e]verything was locked up." [*Id.*].

8

## III.  FACTUAL FINDINGS

The following factual findings are taken from the testimony and exhibits presented at the suppression hearing, as well as Investigator Holmes' audio recording made at the time of Defendant's arrest:

On April 22, 2019, Investigator Holmes, along with a team of four other officers, executed arrest warrants for Defendant, Stephen Bouvier, and Jessica Bouvier.  Defendant was charged with conspiracy to distribute and possession with intent to distribute heroin and fentanyl, as well as drug distribution. At the time of the arrest, all three resided in the same house rented by Defendant. Defendant was taken into custody just inside the doorway of the residence.  Stephen and Jessica Bouvier, who were in the living room, were also taken into custody.  Investigator Holmes took Defendant outside to the driveway at the side of the house.  There, Investigator Holmes advised Defendant of the charges and his Miranda rights.  After being advised of his rights, Defendant continued to talk with Investigator Holmes.  Investigator Holmes asked, "Look, is there anything that I need to worry about inside the house - - anything that might be potentially dangerous to the guys, officers that are standing inside?  Anything - - any fentanyl?"  Defendant responded, "Nah." Investigator Holmes then asked Defendant, "Do you care if we just walk around, look, make sure nothing is laying out?"  Defendant responded, "Sure."  Investigator Holmes notified Officer Blaine that "they could start looking around the residence."

As Investigator Holmes continued to speak with Defendant, Defendant asked if he could get a pair of shoes, and told officers that his shoes were located in his bedroom, which was the front right bedroom, facing the street.  Investigator Holmes searched Defendant, who had in his possession $577 in U.S. currency and two key rings with multiple keys, and then placed him in a cruiser.

Investigator Holmes then interviewed Stephen and Jessica Bouvier, who both stated that Defendant kept contraband in a safe inside his bedroom and that Defendant had received a delivery as recent as that morning or the day prior. As he was concluding his interview with Jessica Bouvier, a uniformed officer walked up and advised Investigator Holmes that they observed what was believed to be crack cocaine on the dresser, a locked safe, and a locked file cabinet in the bedroom.

Investigator Holmes went back to the cruiser where Defendant was sitting and asked if one of the keys on Defendant's key ring would fit the safe or the file cabinet, and advised Defendant that the officers found what appeared to cocaine in the bedroom. Defendant responded that he did not give consent to search the residence.

At that point, Investigator Holmes removed the officers from the residence. Before leaving the residence himself, Investigator Holmes took photos of the locked safe and file cabinet inside Defendant's bedroom. Investigator Holmes observed that the safe was positioned on top of the filing cabinet and that there was a camera set up on the dresser facing the safe. He also observed a canister of Benefiber, as well as a clear baggie of suspected cocaine on the dresser, located approximately two feet from the safe. Investigator Holmes provided the information he had gathered along with the photos to SA Wooden, who then obtained a search warrant for the safe and filing cabinet. The following is a list of items that were seized from the residence:

- pill bottle/powder – bedroom dresser

- digital scales – dresser drawer bedroom

- marijuana – bedroom dresser

- crack – bedroom dresser

- crack – top of dresser bedroom

10

- 2 bundles U.S. Currency – bedroom safe

- 1 pill bottle – safe bedroom

- 2 pill bottles white powder – safe bedroom

- Pill bottle w/ tan powder – safe bedroom

- Lottery ticket/tan powder – safe bedroom

- Bag Gabepentin – top drawer/file cabinet

- 2 boxes Narcan 4 total – middle drawer/file cabinet

- Alcatel android phone – initial search bed

## IV.   ANALYSIS

Defendant seeks to suppress all evidence seized during the search of his residence on April 22, 2019.  Defendant maintains that law enforcement failed to obtain proper consent to search his residence after the execution of the arrest warrant.  [Doc. 314 at 1].  Defendant contends that any consent was not provided voluntarily without coercion, as "[t]here were numerous law enforcement agents, both uniformed and investigators, on the property at that time."  [*Id.* at 2].  Therefore, Defendant asserts that he did not give consent to search the residence, and, alternatively, he limited the scope of any provided consent.  [Doc. 352 at 1–4].  Additionally, Defendant maintains that law enforcement did not have probable cause to obtain a search warrant for the safe and filing cabinet inside of his home.  [*Id.* at 5].  Lastly, Defendant asserts that law enforcement exceeded the scope of the search warrant.  [*Id.* at 7–10].  The Court will address Defendant's arguments in turn.

### A.   Consent to Search

#### 1.   Scope of Consent

Plaintiff asserts that he did not consent to a search of his residence, and law enforcement subsequently exceeded the scope of the consent provided. [*Id.* at 3]. Defendant maintains that he consented only to law enforcement conducting a "walkthrough just 'to see' if anything is laying out." [*Id.* at 4]. The Government responds that Defendant initially consented to the search of his residence, this consent was freely given without coercion, and Defendant subsequently revoked his consent to search. [Doc. 334 at 4]. Additionally, the Government asserts that Defendant "consented to the search of his home by responding 'sure' to the officer's request and by asking the officers to retrieve shoes from his bedroom." [Doc. 387 at 3].

"The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "A consensual search is normally limited by the scope of the consent that supports." *United States v. Elkins*, 300 F.3d 638, 648 (6th Cir. 2002) (internal citation omitted); *see, e.g., Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991) ("The scope of a search is generally defined by its expressed object . . . A suspect may of course delimit as he chooses the scope of the search to which he consents."). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Canipe*, 569 F.3d 597 (6th Cir. 2009) (quoting *Jimeno*, 500 U.S. at 251); *see, e.g., Hall v. Sweet*, 666 F. App'x 469, 475 (6th Cir. 2016) (noting "[t]he scope of consent is determined by objective reasonableness") (citing *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004)). "Thus, a search is not beyond the scope of consent when it was reasonable given its expressed object." *Hall*, 666 F. App'x at 475.

Here, the parties do not dispute the substance of the conversation between Defendant and Investigator Holmes in which Defendant provided consent to search. Under the objective standard, the Court must consider what a reasonable person would have understood from the exchange between Investigator Holmes and Defendant. The defined object of the search was whether there was anything inside of the residence that would be dangerous to law enforcement, such as fentanyl, and whether law enforcement could "walk around" and "make sure nothing is [laying] out." *See* [Tr. 8]. Ultimately, while law enforcement obtained Defendant's consent to walk around the residence, they subsequently exceeded the scope of this consent when searching the closed dresser drawers in the bedroom of the residence.

Defendant did not provide an "open-ended" consent to search the residence. *See United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995), *cited with approval in*, *Canipe*, 569 F.3d at 605. Although fentanyl is illegal contraband, the nature of Investigator Holmes' questioning was not for "general permission to . . . look[ ] for evidence of illegal activity." *Id.* Rather, Investigator Holmes expressly limited the scope of the search to which Defendant provided consent when he asked whether anything dangerous to law enforcement was inside of the residence, and, more importantly, to "make sure nothing is [laying] out." *See* [Tr. 8]; *cf. Canipe*, 569 F.3d at 605 ("When Investigator Hagie asked Canipe whether he had anything in his vehicle that might be unlawful or about which he should know, his questioning placed Canipe on notice that any unlawful item would be the subject of his search. Thereafter, Canipe's general consent to search the vehicle reasonably included permission to search any container that might have held illegal objects."). Neither Defendant nor Investigator Holmes' testimony suggests that law enforcement was "initially given permission for a complete and extensive search of the home." *See, e.g.*, *United States v. Halliburton*, No. 07-20004, 2008 WL 11278049, at *6 (W.D. Tenn. Oct. 22, 2008) ("It is

13

not objectively reasonable that peering into a closed washing machine was within the scope of Defendant Parrett's 'walk through' consent. It is also not clear that it was opened in her presence, thus affording her an opportunity to object."), *aff'd sub nom. on other grounds*, *United States v. Parrett*, 552 F. App'x 462 (6th Cir. 2014).

Defendant also objected to a full search of his residence, including the bedroom, after Investigator Holmes asked whether one of Defendant's keys would fit the safe or file cabinet. Although Defendant was not present for the search of his dresser, he immediately objected upon being informed that suspected cocaine was found in the bedroom, and testified that he did not believe that he consented to a search of the residence. *Cf. Canipe*, 569 F.3d at 606 (holding that the scope of consent was not exceeded when the defendant "made no attempt to revoke or delimit the scope of his omnibus consent, although he was at or near the scene of the search"); *United States v. Foster*, No. 1:15-CR-91, 2016 WL 6882850, at *3 (E.D. Tenn. Nov. 22, 2016) ("Also indicative of the objective reasonableness of the search is that at no point during the search did Defendant object to the search of the truck and camper, clarify the scope of his consent, or withdraw his consent to search.") (citing *United States v. Lucas*, 640 F.3d 168, 177–78 (6th Cir. 2011)).

The Government briefly asserts that Defendant provided consent to search his bedroom when he asked law enforcement to retrieve a pair of shoes. Courts nationwide addressing this issue have found that such a search and warrantless entry under the "clothing and accessories" exception is a subcategory to the exigent circumstances exception to the warrant requirement. *See United States v. McMillian,* No. 11-CR-193, 2012 WL 273735, at *5 (E.D. Wis. Jan. 27, 2012) (collecting cases); *but see United States v. Kinney*, 638 F.2d 941, 945 (6th Cir. 1981) (finding warrantless entry cannot be justified when defendant did not request permission to secure

14

additional clothing and did not consent to an entry of his home).  Here, while Defendant provided

his consent for law enforcement to enter his residence and obtain a pair of shoes, such limited

consent does not extend to the search of a closed drawer.  *See United States v. Bass*, No. CRIM.

11-20704, 2012 WL 1931246, at *7 (E.D. Mich. May 29, 2012) ("Here, Bass gave Trooper Barber

limited consent to enter the residence in order to search for and obtain his shoes from his bedroom

closet.  Bass did not give Trooper Barber general consent to search his residence."), *aff'd*, 785 F.3d

1043 (6th Cir. 2015).

      Therefore, due to the defined object of the search, the Court finds that a typical, reasonable

person, "viewing objectively the exchange that took place" between Defendant and Investigator

Holmes, would not determine that a search to make sure that nothing was laying out inside of the

residence would include a search of closed dresser drawers inside of Defendant's bedroom.  *See*

*Lucas*, 640 F.3d at 177.  Accordingly, the evidence seized during the search of Defendant's dresser

should be suppressed.  However, the Court will also address Defendant's position that any consent

was not voluntarily provided, as well as the Government's argument that some of the evidence

seized from on top of Defendant's dresser was lawfully seized as being in the plain view of law

enforcement.

### 2.      Voluntariness of Consent

      Defendant claims that he did not provide "voluntary consent" to the search of his residence,

and any statements were "unlawfully obtained because they were not freely, knowingly, and

voluntarily given since said statements were obtained in an inherently coercive atmosphere."

[Doc. 314 at 2].

      A warrantless search may be conducted where a person with a privacy interest in the place

to be searched gives free and voluntary consent.  *United States v. Elkins*, 300 F.3d 638, 647 (6th

Cir. 2002). The Government has the burden of proving, by a preponderance of the evidence, that "the consent was voluntarily, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Lucas*, 640 F.3d at 174 (internal quotation omitted). "Whether a consent to search was in fact 'voluntary' or was the product or duress or coercion, express or implied, is a question of fact to be determined from the totality of all circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Although there are no bright line rules to follow when assessing the totality of the circumstances, several factors are to be considered. *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011). "First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Id.* A court should also consider "the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might flaw [an individual's] judgment." *Id.* (internal citations omitted). Lastly, a defendant "must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police in order to invalidate consent." *Elkins*, 300 F.3d at 648.

Although Defendant claims that he was either "next to or inside a patrol cruiser" [Doc. 352 at 3], the Government has shown, based upon clear and positive testimony, that law enforcement obtained valid consent before entering the residence after the execution of the arrest warrants. Nothing in the record suggests that Defendant's age, intelligence, or education would hinder his ability to understand his constitutional rights. Further, the record does not reflect that Investigator Holmes engaged in any conduct that could be considered coercive, or that law enforcement had

their firearms drawn or made illegal threats. Therefore, the Court finds that valid consent was obtained to search Defendant's residence.

### 3.     Plain View Doctrine

As the Court has previously detailed, the search of the dresser in Defendant's bedroom was not permissible as it exceeded the limited scope of Defendant's consent to search. Defendant asserts that the items seized from the bedroom dresser drawer, as well as the top of the dresser, "were not within 'plain view' since their incriminating nature was not observable without opening the drawers themselves." [Doc. 352 at 5]. The Court agrees that any items within the dresser, including the seized digital scales, marijuana, and crack cocaine from within the drawers, were not within law enforcement's plain view. However, at issue is whether the pill bottle and crack cocaine from the top of the bedroom dresser could be seized as a result of the plain view exception.

In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)); *see Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 65–66 (1992) (noting the applicability of the plain view doctrine to consensual searches)

First, the Court finds that law enforcement was entitled to be inside of Defendant's bedroom—whether as a result of conducting a limited search to see if anything dangerous to the officers' safety was laying out or to retrieve Defendant's shoes. *See United States v. Bass*, No. CRIM. 11-20704, 2012 WL 1931246, at *7 (E.D. Mich. May 29, 2012), *aff'd*, 785 F.3d 1043 (6th Cir. 2015); *see, e.g.*, *United States v. Jackson*, 414 F. Supp. 2d 495, (D.N.J. 2006) (finding officer

17

lawfully seized firearm in plain view after the defendant requested that the officer retrieve a pair of shoes from the bedroom).

Next, the Court finds that the crack cocaine on top of the dresser could be seized under the plain view doctrine, as its criminality would be immediately incriminating. Investigator Holmes testified that he was informed by another member of law enforcement that they observed what they believed to be crack cocaine on top of the dresser in Defendant's bedroom. "[T]he Sixth Circuit recognizes that police can reasonably view 'brownish white rock-like substance[s]' as 'crack cocaine.'" *Gover v. Muravchick*, No. 5:17-CV-272-REW, 2018 WL 4518580, at *8 n.19 (E.D. Ky. Sept. 20, 2018) (quoting *United States v. Thomas*, 138 F. App'x 759, 762 (6th Cir. 2005)).

Therefore, at issue is whether the pill bottle was also "of a character that is immediately incriminating." *See United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994) (internal citation omitted). Defendant asserts that the powdery substance inside of the pill bottle was not within plain view, and thus, simply the pill bottle with a label partially off was not immediately incriminating. [Doc. 352 at 9].

"[T]he 'plain view' doctrine requires that the criminality of the articles before the officers be 'immediately apparent.'" *United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Determining whether an item is immediately incriminating "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.) (quoting *Texas v. Brown*, 460 U.S. 730, 741–42 (1983); *Payton v. New York*, 445 U.S. 573, 587 (1980) (emphasis omitted)), *cert. denied* 522 U.S. 925 (1997).

"[I]n determining whether an object's incriminating nature is 'immediately apparent,'" the Sixth Circuit has instructed that "we look to three factors, none of which is necessary but each of which is instructive: (1) 'a nexus between the seized object and the items particularized in the search warrant'; (2) "whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity'; and (3) whether 'the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.'" *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007) (quoting *McLevain*, 310 F.3d at 441 (internal quotation omitted)). Additionally, an "object's incriminating nature is not immediately apparent if it 'appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity.'" *Id.* (quoting *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 555 (6th Cir. 2003) (internal quotation omitted)).

Here, the Court finds that the pill bottle on top of Defendant's dresser was not immediately incriminating to law enforcement upon entering the bedroom. First, the Court notes the lack of testimony regarding the recognition by an officer of its "incriminating nature . . . as a result of his 'immediate' or 'instantaneous sensory perception.'" *Garcia*, 496 F.3d at 511 (quoting *United States v. McLernon*, 746 F.2d 1098, 1125 (6th Cir. 1984)).

Next, a review of the submitted photograph of the pill bottle taken during the execution of the search warrant [Doc. 348-1 at 3] depicts that the wrapper of the bottle was torn and partially off. However, the Court does not find that the "intrinsic nature" of the pill bottle led to probable cause to believe that it is contraband. *See, eg.*, *McLevain*, 310 F.3d at 441–42 ("While the cut cigarette filter and the prescription bottle with fluid in it might be out of the ordinary, the police are not authorized to seize odd items. We do not care what the explanation is for the items, but we

19

care that there may be some other explanation for the items."). Even if the pill bottle appeared suspicious to law enforcement, further investigation would have been required to establish probable cause as to its association with criminal activity. *See Garcia*, 496 F.3d at 510.

Additionally, no officer testified that they were able to identify a substance or powder inside of the bottle on the initial glance, or that any other identifying characteristics of the bottle raised probable cause of its incriminating nature. *Cf. United States v. Benson*, No. 3:18CR146-LSC-SRW, 2018 WL 3870001, at *5 (M.D. Ala. July 16, 2018) ("In this case, the court is satisfied that the incriminating nature of the contents of the bottle was immediately apparent, and that Scott had probable cause based on his training and experience and the facts known to him—including the fact that the bottle was unlabeled, that the substance inside was white and appeared 'squared-off,' and that defendant had recently sold crack cocaine to a confidential informant—to believe that the bottle contained contraband—i.e., crack cocaine."), *report and recommendation adopted by*, 2018 WL 3866440 (M.D. Ala. Aug. 14, 2018); *Evans v. Britt*, No. 7:13-CV-126-FL, 2015 WL 2450547, at *9 (E.D.N.C. May 21, 2015) ("Because the Vicodin pills were not in the correct prescription bottle, and because LPS officers had observed plaintiff give Mr. Smith a pill, the pills' illegal nature was immediately apparent satisfying the third element of the plain view doctrine."); *United States v. Adams*, No. 09-20224, 2010 WL 3070033, at *4 (E.D. Mich. Aug. 4, 2010) ("Given the size of the bottles and the label, Officer Gadwell had probable cause to believe they were associated with criminal activity. Officer Gadwell did not need further investigation; he immediately knew the large bottles of prescription drugs were illegal, and not the usual prescription bottle that a patient might receive when a prescription is filled at a pharmacy.").

Therefore, the Court finds that the crack cocaine on top of Defendant's dresser is admissible as being found in plain view during a consent search, but the pill bottle must be

suppressed as beyond the scope of Defendant's consent and not justified under any exception to the Fourth Amendment's warrant requirement.

### B.    Probable Cause for Search Warrant

Defendant asserts that probable cause did not exist to support the search warrant for the locked safe and filing cabinet in his bedroom.  First, Defendant alleges that "the basis for the search warrant of the locked filing cabinet and locked safe inside the bedroom closet, was based, in part, on the officers' unfettered search of the Defendant's dresser drawers and other areas."  [Doc. 352 at 5].  Defendant maintains that "had the officers never opened the bedroom dresser drawers, or went inside Defendant's bedroom, they would not have had any information with which to seek [the] application of a search warrant."  [*Id.*].  Additionally, Defendant claims that there was not sufficient information to establish probable cause to search the filing cabinet in the application for the search warrant, as the "only information pertaining to the filing cabinet were the officer's observations that it 'might' contain evidence of a crime."  [*Id.* at 6].

The Government responds that the search warrant particularly and specifically described the places to be searched and the items to seize.  [Doc. 334 at 4].  The Government claims that even if the cocaine and digital scales seized from within the dresser were excluded, probable cause still existed to support the search warrant.  [Doc. 387 at 6].  Here, the Government asserts that law enforcement had been conducting an in-depth investigation into Defendant and his residence at 1203 Texas Avenue, noticed a suspicious pill bottle and crack cocaine on top of a dresser, and then Jessica and Stephen Bouvier responded that Defendant typically kept drugs in his room.  [*Id.* at 6–7].

Under the Fourth Amendment, there must be probable cause for a search warrant to issue, and the warrant must be based on facts that demonstrate "a fair probability that evidence of a crime

will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)); *see also United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) ("An issuing judge may find probable cause to issue a search warrant when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005)). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.) (en banc), *cert. denied*, 543 U.S. 851 (2004). There must be a "nexus between the place to be searched and the evidence sought." *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

In determining whether an affidavit establishes a nexus, the undersigned begins by observing that the issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir.) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)), *cert. denied* 531 U.S. 907 (2000). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The "duty of a reviewing court is simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39. In making this determination, the Court considers only the information that was before the issuing judge, *i.e*, only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir.), *cert. denied,* 560 U.S. 959 (2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

SA Wooden's affidavit set forth the following information about Defendant's suspected drug activity and the search of his residence:

> ANDERSON also stated that she sold 10 grams of heroin per day to a black male named "Virgil," later identified as Virgil Crawford, who runs a drug house at TARGET LOCATION C. ANDERSON also stated Jessica and Stephen Bouvier now distribute drugs for Virgil.
>
> . . .
>
> On April 16, 2019, 15 members of the DTO were indicted on federal conspiracy and other drug related charges. Arrest warrants were issued to accompany the indictments. On April 22, 2019, law enforcements executed a number of arrest warrants in this case.
>
> . . .
>
> The arrest warrant of CRAWFORD was executed at his address at 1203 Texas Avenue, Knoxville, TN 37921 on April 22, 2019. CRAWFORD answered the door at the residence. CRAWFORD initially consented to the search of his residence. During the consensual search of the residence officers observed suspected cocaine and a set of scales in the residence. Officers noticed a locked safe and a filing cabinet in the same room as the suspected cocaine and scales. In addition, co-defendants Stephen and Jessica Bouvier were also found to be in the home and were arrested. Once officers questioned CRAWFORD about the locked safe and filing cabinet he then revoked consent. Jessica Bouvier stated that CRAWFORD typically kept items in areas of his bedroom to include a locked safe. I believe probable cause exists that TARGET LOCATION C contains evidence, fruits, and instrumentalities of Title 21, United States Code, Sections 846, and 841(a)(l).

[Doc. 334-2 at 28, 40–41].

The Court cannot consider the information in SA Wooden's affidavit related to the scales and suspected cocaine found within the drawers of the dresser in Defendant's bedroom, as "[t]he exclusionary rule prohibits introduction into evidence . . . of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988). However, the Court can consider the cocaine on top of the dresser in SA Wooden's affidavit, as the Court has found that this evidence was properly seized upon being in plain view. *See Shamaeizadeh v. Cunigan*, 338 F.3d 535, 552 (6th Cir. 2003) ("Therefore, in determining whether

23

probable cause was present for issuance of the first search warrant, we need not redact Cunigan's affidavit to exclude all evidence that was seized during the second and third searches in violation of someone's constitutional rights. Rather, we exclude from the affidavit only evidence gathered from the main floor of the house in violation of Shamaeizadeh's constitutional rights.").

Defendant states that Investigator Holmes testified that nothing on top of the filing cabinet or its outward appearance made it obvious that it would contain illegal items. Further, Defendant claims that "[t]he application for [the] search warrant does not make it clear that anyone corroborated Jessica Bouvier's information, but used her statement(s) and their hunch to obtain a search warrant." [Doc. 352 at 7]. Upon review of the non-excluded information in the supporting affidavit to the search warrant, the Court finds that enough probable cause exists, even excluding the suppressed evidence, to justify the search warrant.

The "nexus [between the place to be searched and the evidence sought] may be established by the nature of the items and normal inferences of where a person would keep such items." *United States v. Hawkins*, 278 F. App'x 629, 634 (6th Cir.), *cert. denied*, 555 U.S. 1019 (2008). The Sixth Circuit has held that "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking," *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008), but that "a defendant's status as a drug dealer, standing alone" will not "give[ ] rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005). "Therefore, to meet the probable cause standard, an affidavit must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer." *United States v. Jenkins*, 743 F. App'x 636, 642 (6th Cir.) (quoting *United States v. Brown*, 828 F.3d 375, 382–84 (6th Cir. 2016) ("[O]ur cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing

24

activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer.")), *cert. denied*, 139 S. Ct. 611 (2018).

While the mere fact that an individual is a drug dealer is not sufficient to establish probable cause to search an individual's residence, *see Frazier*, 423 F.3d at 533, SA Wooden's affidavit provided specific facts connecting Defendant's residence with his alleged distribution of drugs. *Cf. Brown*, 828 F.3d at 384 (holding that "if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or if the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer."). Here, the remaining portions of SA Wooden's affidavit include information from "Anderson," a cooperating informant who stated that she sold ten grams per day of heroin to Defendant, that he was operating a drug house out of his residence, and that Jessica and Stephen Bouvier distributed drugs for Defendant. [Doc. 334-2 at 28]. The affidavit also provides that Defendant was indicted on federal conspiracy and other drug related charges. [*Id.* at 40]. After excluding the information involving the scales and cocaine inside of the dresser drawers in the affidavit, it further details that a search of Defendant's residence revealed suspected cocaine and a locked safe and filing cabinet inside of his bedroom. [*Id.* at 41]. Additionally, the affidavit provides that Jessica Bouvier stated that Defendant typically kept items in certain areas of his bedroom, including the locked safe. [*Id.*]. Therefore, SA Wooden's affidavit directly connected Defendant's residence to his suspected drug dealing through Anderson's statements and the suspected cocaine in the bedroom during the execution of the arrest warrant and subsequent limited search.

25

An issuing magistrate may infer a nexus between a suspect and his residence, depending on "the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and normal inferences that may be drawn as to likely hiding places." *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985). Although Defendant challenges whether probable cause exists as to the search of the filing cabinet, the Court finds that a "normal inference[ ]" can be drawn that the filing cabinet would be a "likely hiding place[ ]" in Defendant's bedroom. *Id.* The supporting affidavit connected Defendant's residence to his suspected drug dealing, and further, that he kept certain items locked in his bedroom. SA Wooden's affidavit does not detail that Jessica Bouvier stated that Defendant only kept items in his locked safe; but rather that he typically kept items in his bedroom, including but not limited to, his safe.

Contrary to the facts in *Brown*, SA Wooden's affidavit contains "evidence that [Defendant] distributed narcotics from his home, that he used it to store narcotics, [and] that any suspicious activity had taken place there." 828 F.3d at 382. "Taken together with the inference 'that drug traffickers use their homes to store drugs and otherwise further their drug trafficking,' *Williams*, 544 F.3d at 687, and the additional specific facts articulated in the affidavit, there was probable cause to support issuance" of the search warrant. *Jenkins*, 743 F. App'x at 642–43. Therefore, the Court finds that the information remaining in SA Wooden's redacted affidavit established by a "fair probability that contraband or evidence of a crime" would be found in the safe and filing cabinet in Defendant's bedroom. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

As the Court has found that the non-suppressed evidence set forth in the affidavit in support of the search warrant establishes probable cause, the undersigned will not conduct an extensive good faith analysis at this time. "When evidence is obtained in violation of the Fourth Amendment,

26

the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, if the evidence was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," then it should not be suppressed. *United States v. Leon*, 468 U.S. 897, 922, (1984). "[T]he decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010).

There is "an exception to the exclusionary rule where 'the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid.'" *United States v. Watson*, 498 F.3d 429, 431 (6th Cir. 2007) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 987-88 (1984)). The good-faith exception will not apply where "the affidavit is 'so lacking in [indicia of] probable cause as to render official belief in its existence entirely unreasonable'" or "where the officer's reliance on the warrant was neither in good faith nor objectively reasonable." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 923).

The Court notes "conflicting authority, even within the Sixth Circuit, concerning whether the good faith exception can ever be applied when officers act pursuant to a search warrant obtained through information gained during an illegal predicate search." *United States v. Rounsaville*, No. 1:17-CR-69-HSM-SKL, 2018 WL 6177963, at *12 (E.D. Tenn. July 27, 2018), *report and recommendation adopted by*, 2018 WL 4909903 (E.D. Tenn. Oct. 10, 2018). However, the Sixth Circuit has found that "the good-faith exception applies, even if a warrant is based on an illegal predicate search, where 'the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable.'" *United States v. Fugate*, 499 F. App'x 514, 519 (6th Cir. 2012)

(citing *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) and noting "[w]e are bound by *McClain*").

However, if the District Judge finds that law enforcement did not have probable cause for the warrant, the fruits of the search would still be admissible because the evidence was discovered during the good-faith execution of the seemingly valid warrant. Although the affidavit included evidence from the unconstitutional search of Defendant's dresser, law enforcement had an objectively reasonable, good-faith belief in the validity of the search warrant, and the affidavit "disclosed 'the circumstances surrounding the initial warrantless search.'" *Rounsaville*, 2018 WL 6177963, at *13 (quoting *McClain*, 444 F.3d at 566). Further, SA Wooden's affidavit was not so lacking in indicia of probable cause involving Defendant as to render law enforcement's belief unreasonable, and thus the reliance on the warrant was objectively reasonable. *See, e.g.*, *United States v. Elizondo*, 331 F. Supp. 3d 757, 765 (E.D. Mich. 2018) ("The affidavit in this case connects defendant to the vehicle, the vehicle to the house, and the house to defendant. *Washington* confirms that these are the precise connections required to overcome the 'so lacking in minimal indicia' test in order for the good faith exception to apply.") (quoting *United States v. Washington*, 380 F.3d 236, 242–43 (6th Cir. 2004)). The Court also notes that any good faith finding would not affect the suppression of evidence seized from Defendant's dresser or the dresser drawers because these locations were not listed in the search warrant.

### C.     Exceed Scope of Search Warrant

Lastly, Defendant claims that law enforcement "flagrantly disregarded the scope of the places to be searched and conducted searches of other containers, and secure places inside Defendant's home, resulting in additional seizures of his personal property, in violation of the Fourth Amendment." [Doc. 352 at 7]. Defendant challenges the search and seizure of several

28

items "located inside [of] Defendant's dresser drawer," claiming that they were improperly seized because they were not listed in the search warrant or encompassed by the limited scope of his consented search. [*Id.* at 8]. Specifically, Defendant points to the pill bottle taken from the bedroom dresser, the crack cocaine on top of the dresser, and the digital scales, marijuana, and crack cocaine taken from within the dresser drawer. [*Id.*].

However, the Court has already found that the pill bottle on top of the dresser should be suppressed as not being within plain view of the officers' search, as well as that the crack cocaine on top of the dresser was properly seized under the plain view exception. Additionally, the Court found that the search of the items in Defendant's dresser was not warranted under the limited scope of the consented search or under the April 22, 2019 search warrant. Therefore, the digital scales, marijuana, and crack cocaine taken from within Defendant's dresser drawer should be suppressed.

## V.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that law enforcement exceeded the scope of Defendant's consent when searching the dresser of his bedroom. Therefore, the Court finds that the evidence seized from within the dresser drawers, including the digital scales, marijuana, and crack cocaine from within the drawers, should be suppressed. Additionally, the Court finds that the crack cocaine from on top of Defendant's dresser is admissible under the plain view doctrine, while the pill bottle also on top of Defendant's dresser should be suppressed, as its criminal nature was not immediately incriminating. Lastly, the Court finds that remaining information in SA Wooden's affidavit established probable cause to support the resulting search warrant. Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress Evidence [**Doc. 300**] be **GRANTED IN**

**PART to suppress all evidence seized from inside the dresser as well as the one pill bottle on top of the dresser and DENIED in all other respects**.[6]

Respectfully submitted,

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).